OPINION OF THE COURT
Edward H. Lehner, J.
The central legal issue raised in this action, commenced by the City of New York (the City) to enforce a lien filed in 1998 in the amount of $284,861.95 for expenses incurred in relocating 55 people allegedly illegally residing in the basement of the building located at 47 Canal Street (the building), is whether such persons may be deemed “tenants” pursuant to the provi *717 sions of section 26-305 of the Administrative Code of the City of New York.
On March 18, 1994 the City fire department executed an order to vacate the occupants of the basement of the building. The testimony showed that as a result 55 persons were relocated from this commercial building. The order stated that the reasons for its issuance were: “No secondary means of egress from cellar, Inadequate fire protection, Overcrowding, Illegal single room occupancies.” The evidence showed that the basement, which had been divided into many small cubicles, was entirely uninhabitable, there being no kitchen facilities, no heat, only one toilet, no shower, no windows, no clothes cabinets, no mailbox and no garbage removal services. A propane gas device was apparently used for cooking.
After the occupants were removed, the City provided them relocation services, which were stipulated to have resulted in expenditures by the City of $284,861.95, for which sum the City filed a lien against the building pursuant to subdivision (4) of section 26-305 of the Administrative Code.
The principal of the defendant, Jeanne Jackson, testified that she was unaware of the presence of the basement occupants and was “shocked” when she was called to the premises by the fire department when it executed the vacate order. Although she indicated that her office was located only a few blocks from the building, she stated that she had not visited the premises for several months, “because it’s a commercial building, [and] there’s hardly any problems” (transcript at 141).
In November 1993 the basement of the building was leased to Kuo Tao Cheng to be used for “handbag finishing” for a period of two years at a rental of $1,320 per month. Defendant argues that the presence of the persons in the basement was a scam established to enable the occupants to obtain a priority in procuring housing from the City, and that said persons had been living in the building for no more than a day or two prior to the execution of the vacate order. The firefighter who executed the order testified that there were beds for only 20 persons at the location (transcript at 39).
To show that the basement had been occupied by the persons evicted for a lengthier period, plaintiff produced Gabrielle Anderson, the director of the Office of Emergency Housing Services, who testified as to the City procedure for providing relocation services. She submitted copies of receipts issued by Mr. Cheng to several of the occupants showing payments to *718 him for a few months, as well as copies of envelopes showing that mail was received at the building by several of the occupants, including mail postmarked in China. However, plaintiff could only produce documents for 17 of the 55 persons it relocated. Defendant contended that the receipts produced were fraudulent and all a part of the aforesaid scam conducted by Mr. Cheng.
Subdivision (1) of section 26-305 of the Administrative Code provides:
“Whenever the department of housing preservation and development has incurred expenses in providing relocation services for tenants pursuant to subparagraph (v) of paragraph (a) of subdivision one of section 26-301 of this chapter, the department shall be entitled to reimbursement of such expenses from the owner of the building from which such tenants were relocated, if the conditions giving rise to the need for such relocation arose as a result of the negligent or intentional acts of such owner, or as a result of his or her failure to maintain such dwelling in accordance with the standards prescribed by the housing or health code governing such dwelling.”
The above-mentioned subparagraph (v) of section 26-301 (1) (a) of the Administrative Code provides:
“1. The commissioner of housing preservation and development shall have the power and it shall be his or her duty:
“(a) To provide and maintain tenant relocation services * * *
“(v) for tenants of any privately owned building where the displacement of such tenants results from the enforcement of any law, regulation, order or requirement pertaining to the maintanance [sic] or operation of such building or the health, safety and welfare of its occupants.”
Defendant argues that since the 55 occupants relocated by the City were not “tenants” as that term is used in the above-quoted section, it is not liable for the relocation expenses. It is agreed that there is no definition of the term in chapter 2 of title 26 of the Administrative Code dealing with “Relocation Services.”
Discussion
Initially it is observed that the above-quoted subparagraph (v) refers to relocation services to “tenants of any privately *719 owned building,” whereas in paragraph (e) of the same subdivision (1) dealing with relocation from city-owned dwellings the statute refers to services for “occupants who relocate.” 28 RCNY 18-01 (a) defines a “relocatee” for whom relocation services are to be provided pursuant to the aforesaid statute as: “an individual or a head of household and his/her family, deprived of a permanent residence rented by him/her to them in the City of New York as a direct result of the enforcement of a Vacate Order.”
Most penalties imposed for violations of title 26 have maximum fines of $5,000. (See, §§ 26-122 — 26-126.) However, section 26-127.1 authorizes a maximum civil penalty against a person who violates a vacate order of $25,000, and an additional $1,000 for each day the violation continues. Here the alleged violation has resulted in the filing of a lien for expenses incurred by the City of $284,861.95, which with accrued interest has created a potential liability upon defendant of approximately $400,000.
Although the relocation services provided by the City to the aforesaid 55 persons clearly reflect humanitarian efforts by our City government to aid people who had no true residence, the court finds that these 55 persons cannot be deemed “tenants” of this basement room which contained only approximately 20 beds. While some of the 55 individuals may have slept in the premises for more than a few days, there is no proof how many were there for any particular period of time. As noted above, the files for 38 of the relocatees were not produced. Significantly, none of the relocatees testified although the plaintiff certainly knew the addresses where the relocatees were placed. Although the relocations occurred prior to June 1998, the City offered no evidence that it attempted to reach any of such persons.
While the subject statute does not define the term “tenant,” it does, as noted above, use a different term, to wit, “occupant” when referring to persons relocated from City-owned buildings. I find this significant as a tenant would generally be one with greater rights than an occupant. For example, while RPAPL 711, setting forth parties against whom a summary proceeding may be commenced, does not define the term “tenant,” it does state that the term “tenant” includes “an occupant” of one or more rooms in a hotel or rooming house. Thus, an occupant for less than 30 days is not a tenant under that statute. Real Property Law § 235-f (the “roommate” law) defines “tenant” as one who is a party to a lease or has rights as a statutory tenant, *720 while an “occupant” means a person other than a tenant “occupying a premises with the consent of the tenant or tenants” (Real Property Law § 235-f [1] [b]).
Further, the term “tenant” would not include a licensee. This is illustrated in the case of American Jewish Theatre v Roundabout Theatre Co. (203 AD2d 155, 156 [1st Dept 1994]), where the Court wrote:
“The nature of the transfer of absolute control and possession is what differentiates a lease from a license or any other arrangement dealing with property rights. * * * Whereas a license connotes use or occupancy of the grantor’s premises, a lease grants exclusive possession of designated space to a tenant, subject to rights specifically reserved by the lessor.” (Emphasis supplied; see also, Feder v Caliguira, 8 NY2d 400 [1960]; Nextel of N.Y. v Time Mgt. Corp., 297 AD2d 282 [2d Dept 2002].)
Moreover, the above-quoted definition in the City’s rules as to who is a “relocatee” and thus entitled to relocation services under the statute refers to a person who has been “deprived of a permanent residence rented by him/her or them * * * as a direct result of the enforcement of a Vacate Order.” It cannot be said that any of the 55 relocatees were deprived of a permanent residence by reason of the execution of the vacate order as the subject basement space could in no sense be deemed such a residence. The definition set forth in this rule, adopted by the agency responsible for the administration of the statute, should be followed as it is not irrational or unreasonable. (See Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459 [1980].)
Here the evidence showed that defendant was negligent in not knowing that its tenant had performed construction to create cubicles for 20 beds and that people were illegally sleeping there. The evidence does not support defendant’s contention that the construction of the cubicles occurred only a day or two before execution of the vacate order. Hence, defendant was subject to liability for relocation costs of tenants pursuant to section 26-305. However, since the court finds that the persons relocated were not “tenants,” defendant is not liable for the relocation expenses for these 55 individuals. Hence, the action is dismissed and the clerk shall enter judgment accordingly and shall cancel the aforesaid lien heretofore filed against the building by plaintiff.