Lawrence J. DEUTSCH,
Appellee-Cross-Appellant,

v.

HEALTH INSURANCE PLAN OF
GREATER NEW YORK,
Appellant-Cross-Appellee.

Nos. 260, 329, Dockets 84–7484, 84–7530.

United States Court of Appeals,
Second Circuit.

Argued Oct. 18, 1984.
Decided Dec. 11, 1984.

Edward R. Korman, Stroock & Stroock & Lavan, New York City (Madelaine R. Berg, New York City, of counsel), for appellant-cross-appellee.

John D. Gordan, III, Lord, Day & Lord, New York City (M. Breeze McMennamin, New York City, of counsel), for appellee-cross-appellant.

Before OAKES and WINTER, Circuit Judges, and CLARIE, District Judge.*

OAKES, Circuit Judge:

This breach of contract case has resulted in three opinions handed down before trial, a bench trial with resultant findings of fact and conclusions of law [1] and comes to us with only five hotly contested issues from the United States District Court for the Southern District of New York, Leonard B. Sand, Judge. A contract between Health Insurance Plan of Greater New York (HIP) and Dr. Lawrence J. Deutsch was undeniably breached by HIP. The extent of the breach as well as the amount of damages are presently in dispute. We affirm.

FACTS

HIP is a nonprofit "health maintenance organization" providing medical services to subscribers in Greater New York. In exchange for premiums, subscribers are entitled to medical care at one of HIP's groups, which are independent physician partnerships and professional corporations under contract with HIP. When specialized treatment, such as audiology testing, is required, the subscriber is referred to an outside specialist approved by HIP's Medical Control Board.

Dr. Deutsch, a Connecticut audiologist, and HIP—through Dr. Earl Harris, the chairman of HIP's Special Services Fund—entered into a contract in 1980 whereby Dr. Deutsch agreed to perform audiological evaluations and hearing aid consultations for HIP subscribers for $32 per patient visit, subject to certain limitations irrelevant here. In turn, HIP granted Dr. Deutsch the exclusive right to referral for all audiological evaluations and hearing aid consultations for the period from July 1, 1980, to June 30, 1982, subject to the exception that Edna Dvosin, with whom HIP had been doing business, could perform the same number of audiological evaluations she had performed for HIP in the twelve months before the contract. The contract was subject to automatic renewal for an additional two-year period unless HIP gave notice in writing of cancellation at least sixty days prior to the expiration of the initial term. The contract was also subject to cancellation at any time on sixty days' notice by Dr. Deutsch. While not mentioned in the contract, Dr. Deutsch was also told he could expect to perform related procedures, such as electronystagmography (ENG) tests, Brain Stem Evoked Response (BSER) tests, and hearing aid dispensing.

At the time the contract was signed Dr. Deutsch maintained an office as a sole proprietor in Queens, New York, and was a member of partnerships in Manhattan and Great Neck, Long Island, that performed audiological services. Soon after the contract was signed he also became a member of a similar partnership in Brooklyn. Dr. Deutsch was a one-third partner in all but the Brooklyn partnership, in which he had a 30% interest. Because Dr. Deutsch was

* Of the District of Connecticut, sitting by designation.

1. The district court opinions include one concerning defendant's motion for summary judgment, *Deutsch v. Health Ins. Plan,* 573 F.Supp. 1433 (S.D.N.Y.1983); one concerning plaintiff's motion to strike defendant's counterclaim,

*Deutsch v. Health Ins. Plan,* 573 F.Supp. 1443 (S.D.N.Y.1983); an unpublished opinion dated November 29, 1983, concerning defendant's motion for reargument; and unpublished findings of fact and conclusions of law dated May 1, 1984, after trial.

unable to perform all of the HIP business himself, he arranged to have HIP patients tested at the offices of his partnerships. For audiological evaluations, the partnership would receive $20 of the $32 HIP paid Dr. Deutsch; for ENG tests, $40 of the $45 HIP paid Dr. Deutsch; and for BSER tests, $75 of the $100 HIP paid Dr. Deutsch. Suffice to say, Dr. Deutsch retained the remainder of the HIP fee.

HIP breached the contract's exclusivity provisions. Principally, the breach was attributable to the failure of the East Nassau Medical Group (East Nassau), a HIP affiliate, to refer any of its audiology patients to Dr. Deutsch. These patients would have been tested by Dr. Deutsch's partnership in Great Neck, known as Great Neck Audiology Associates. The district court found that some 3,946 audiological patients were sent by East Nassau to someone other than Dr. Deutsch or his partnership. On December 9, 1982, Dr. Deutsch sold his interest in the Great Neck partnership for $10,-000 plus assumption of liabilities and lease of premises because the lack of HIP referrals was causing the business to operate at a loss.[2] The buyer, who was the only remaining partner, agreed to make no claim or demand against HIP and waived any share in future payments Dr. Deutsch might receive from HIP.

The district court also found several other breaches. Some 454 audiograms were performed by Ms. Dvosin in breach of the contract provision that limited the number of HIP referrals she could receive. Moreover, 228 other audiograms were performed by various other audiologists after referrals in breach of the contract. Thus, a total of 4,628 audiology patients should have been referred to Dr. Deutsch but were not.

The district court assessed damages by totaling Dr. Deutsch's personal net profit lost and his share of the partnerships' lost profits. The district court found $55,536 damages for the loss of Dr. Deutsch's net fee of $12 per audiological referral. It also found 582 ENG tests performed as a result of referrals outside the contract for which Dr. Deutsch would have received a net fee of $5 per test, or $2,910, as well as 73 BSER tests at $25 per test, or $1,825. Thus, total damages to Dr. Deutsch personally were found to be $60,271 less $3,934 savings in administrative expense, for a net profit lost of $56,337. The district court also awarded Dr. Deutsch, after subtracting the partnerships' expenses, $66,767— one-third of the $200,300 in lost partnership revenues—less $2,400, Dr. Deutsch's share of the savings to one of the partnerships resulting from the breach, or $64,367 for lost partnership profits. Thus the total judgment prior to the award of interest was $56,337 plus $64,367, or a total of $120,704.

The bones of contention on appeal are as follows:

1. HIP claims that, despite the fact that it gave no notice of termination, Dr. Deutsch should not be able to recover damages for the renewal period—the second two years of the contract—since he knew full well that HIP was in partial breach and did not intend to send him audiological referrals from East Nassau. The district court awarded damages for the renewal term.

2. HIP claims that Dr. Deutsch is not entitled to recover any damages on behalf of his partnerships for tests that would have been performed. It concedes, however, that he is entitled to the $12 he would have received for each test, even though it was to be performed by a partnership. By contrast, Dr. Deutsch claims that he is entitled to recover the full $20 on behalf of his partnerships. As noted above, the

**2.** Although Dr. Deutsch had a one-third interest in the Great Neck partnership in 1980, by early 1982 he and one of the other partners had bought out the third partner, giving each of the remaining partners a one-half interest. This first change in the partnership also resulted from the decline in the partnership's business that resulted from HIP's breach. The district court properly assumed that if HIP had not breached the contract Dr. Deutsch would have held a one-third interest in the partnership throughout the term of the contract.

court awarded Dr. Deutsch one-third of the lost partnership profits.

3. Dr. Deutsch argues that HIP breached the contract when "superspecialists," that is, ear, nose, and throat doctors, performed audiological examinations incidental to consultations for other purposes. The court found that the audiological examinations performed by superspecialists did not constitute a breach of the contract.

4. Dr. Deutsch also claims a reduction in the going concern value of his Great Neck partnership of $100,000 as a result of HIP's breach. The court awarded him nothing on this claim.

5. Finally, HIP argues that the district court erred in awarding Dr. Deutsch lost partnership profits on the sale of hearing aids amounting to about $25,000.[3] At the time the contract was entered into New York law, N.Y.Gen.Bus.Law § 785–a(2), forbade any audiologist who recommended a hearing aid, among others, from engaging in the business of fitting, renting, or selling hearing aids for a profit, except for a 5% markup over the net cost for handling and losses established by regulation. N.Y. Admin.Code tit. 19, § 191.18(a) (1978). The statute's reference to audiologists was repealed while the contract was in effect. *See* 1983 N.Y.Laws ch. 873, § 1. HIP claims that Dr. Deutsch was not entitled to recover these damages because they were not foreseeable and that, in any event, the most that he could recover would be lost profits for the eleven-month period after the statute was repealed. The court held that Dr. Deutsch was entitled to recover lost hearing aid profits over the entire term of the contract.

## DISCUSSION

### The Renewal

In essence, HIP claims that the events surrounding the renewal show that the parties had modified their agreement. HIP did not give notice that it did not wish to renew "in writing by registered or certified mail" at least sixty days prior to the expiration of the agreement, as required by the renewal clause.[4] Nevertheless, according to Dr. Deutsch, at least six months before the renewal date Dr. Deutsch not only knew that HIP had broken its contract but also "began to realize that HIP's representatives had misled him for eighteen months about their efforts to mend the breach." Thus, while HIP was telling Deutsch that it was trying to get the East Nassau group to send their patients to him, Deutsch knew that HIP had given up trying to change East Nassau's referral policy.

HIP argues that Deutsch was on notice that HIP would not agree to renew the contract insofar as it provided for audiological referrals from East Nassau because, under New York law, *Custen v. Robison*, 180 A.D. 384, 387, 167 N.Y.S. 1013, 1016 (1917), notice by way of breach is equiva-

---

**3.** The sum of $25,780 is said by HIP to be the "exact figure." Ours is different and is arrived at by multiplying $225, the net of instrument cost, times 275 sales from the East Nassau Medical Group, 47 sales from others, and 26 referral sales, totaling $78,300, one-third of which equals $26,100, less $1,293 in expenses for hearing aid sales, for a total of $24,807.

**4.** The renewal clause read:

a) This agreement shall be for a two year period, commencing on July 1, 1980 and continuing until June 30, 1982, provided that this agreement may be terminated by either party giving to the other not less than sixty (60) days notice in writing by registered or certified mail, which notice is to be sent to the respective address as may be designated by the party to whom the notice is given.

b) HIP may give notice of termination only after a final determination is made by the Medical Control Board of HIP that services provided under this agreement are professionally substandard, which final determination shall be made only after Dr. Deutsch is advised in writing, is granted an opportunity to be heard, and is given a thirty (30) day period within which to rectify or remedy any alleged deficiencies.

c) At least sixty (60) days prior to the expiration of this agreement, HIP shall notify Dr. Deutsch in writing, in the manner set forth in Paragraph 7(a), of its intention not to renew this agreement; otherwise this agrement [*sic*] shall be deemed further renewed from and after July 1, 1982 for an additional two year period, subject to renogiation [*sic*] of patient visit fees.

lent to the formal notice required by automatic renewal clauses of the kind at issue here. In *Custen* and similar cases, *see, e.g., Restaurant Associates Industries, Inc. v. Anheuser-Busch, Inc.,* 422 F.Supp. 1105, 1107–08 (S.D.N.Y.1976), *aff'd in part and rev'd in part on other grounds,* 559 F.2d 1205 (2d Cir.1977) (unpublished opinion), courts have held that, in the face of actual knowledge by plaintiff of the defendant's breach of the contract or intent to exercise its option not to renew, automatic renewal is not triggered notwithstanding defendant's failure to comply literally with the procedure for notification prescribed in the contract.

In addition, HIP suggests that contract "interest" analysis [5] supports the application of the *Custen* holding in this case. According to HIP, Deutsch has no "restitution interest," because Deutsch conferred no benefit on HIP during the renewal period. Nor is there any "reliance interest" since Deutsch understood that the breach would not be cured. Finally, there is no "expectation interest" because Deutsch was on notice that HIP would not refer the East Nassau patients.

The district court found that Dr. Deutsch never acquiesced in a new bilateral understanding because he repeatedly objected to HIP's apparent breach throughout the initial term of the agreement. The court went on to undercut HIP's interest analysis argument holding that "in the absence of cancellation *in toto* by HIP, [Dr. Deutsch's] expectation of profit for the contract at issue encompassed full performance by HIP for the four years of the agreement." Dr. Deutsch argues that the district court's decision is bolstered by the fact that HIP's breach was not an unequivocal proposal for modification. At the time of renewal, there were substantial breaches existing and continuing in Manhattan as well as on Long Island. *Cf. Garcia v. Chase Manhattan Bank, N.A.,* 735 F.2d 645, 648–49 (2d Cir.1984) ("Repudiation must be clear and unequivocal to constitute an anticipatory breach of contract.").

■ We agree with the district court that HIP's reliance on *Custen v. Robison* is misplaced. *Custen* simply holds that a defendant's breach by complete termination of any further performance midway through the initial term of the contract is notice adequate to dispense with the subsequent writing that the defendant would not resume performance for the optional renewal term. Here HIP did not cease its own performance; it continued to require and accept the benefits of Dr. Deutsch's performance for thousands of patients during both the initial and renewal terms.

HIP had no right to partial termination of the contract. It could not give notice of such termination either by writing or, under the *Custen* theory, by breach. This case involves modification, not notice. HIP must argue that its actions and Dr. Deutsch's reactions evidence an agreement to modify the terms of the contract. Yet HIP's only claim is that at the time of renewal Deutsch knew that he would not be receiving referrals from East Nassau. We believe that the New York courts would hold that one party's knowledge of such a partial breach at the time of renewal does not show that he has agreed to a modification in the terms of the contract. If HIP had shown that Dr. Deutsch knew that HIP would not renew at all unless he agreed to acquiesce in the modification, the New York courts might be more receptive to HIP's claim; here, however, HIP never made any statement about conditions of renewal to Dr. Deutsch.

HIP also makes the argument that its position is supported by the policy against automatic renewal provisions as notorious traps for the unwary contractor. *See Feder v. Caliguira,* 8 N.Y.2d 400, 405–06, 208 N.Y.S.2d 970, 973–74, 171 N.E.2d 316, 318–19 (1960) (holding that an agreement is not a lease of personal property and thus can include an automatic renewal provision). HIP points to the New York General Obligations Law, which requires providers of certain services and lessors of personal

---

**5.** See Restatement (Second) of Contracts § 344    (1981).

property to give notice that an automatic renewal is about to take place. *See* N.Y. Gen.Oblig.Law § 5–901, –903 (McKinney 1978). Needless to say, HIP does not claim that these statutes literally apply to this contract; it argues that we must consider the public policy underlying these statutes. Yet, this public policy argument does not aid HIP. We take it that the New York legislature may have had good reasons for limiting the application of this policy against automatic renewal. HIP and Dr. Deutsch were on an equal footing, negotiating at arm's length and from equal positions of strength. After all, the two-year contract with an automatic two-year renewal was more favorable to HIP than the fixed four-year term that Dr. Deutsch said he initially requested. No unwary victim of an automatic renewal trap, HIP seeks to profit by its own breach and the coverup of that breach, as well as apparent delinquency in looking to the terms of the contract. We agree with Judge Sand that New York law would not permit it to do so.

*The Partnerships*

Out of the $120,704 judgment, $64,367 was awarded to Dr. Deutsch as his one-third share in the profits his partnerships would have received if HIP had not breached the contract. Both parties challenge the district court's decision.

■ On one hand, HIP argues that since the partnerships were neither parties to nor third party beneficiaries of the contract, they could not have brought suit against HIP to recover damages that they may have suffered as a subcontractor. *See Portchester Electrical Construction Corp. v. Atlas*, 40 N.Y.2d 652, 655, 389 N.Y.S.2d 327, 330, 357 N.E.2d 983, 986 (1976) (third party as "merely an incidental beneficiary"). While we agree with HIP's assessment of the New York Law, we find that, when Dr. Deutsch's one-third share in the $20 is accurately characterized as consequential damages, HIP's arguments dis-

solve. HIP, in fact, concedes that other lost partnership profits were correctly assessed as consequential damages by the district court.

■ On the other hand, referring us to, inter alia, *Law v. Cross*, 66 U.S. (1 Black) 533, 17 L.Ed. 185 (1862), Dr. Deutsch argues that the district court erred in reducing the damages award by two-thirds and that indeed he should have been awarded the entire lost partnership profits. The argument is that HIP and the courts have no interest whatever as to how the matter is to be settled among the partners. We agree with the district court's assessment of damages, however, and in doing so we give due deference to the district court's knowledge or should we say, estimation of New York law. *Law v. Cross* and cases like it [6] cited to us by Dr. Deutsch, permitting one partner to recover all of the damages to the partnership, are distinguishable from the case we have before us. In each of these cases, the partnership shared in the entire profits and losses of the contract made by the partner. Here the partnerships were to receive only a fee for performing the audiological services; they were more in the nature of subcontractors, as HIP argues.

Dr. Deutsch's argument hinges on his alleged inability to contract with his partnerships. While *Law v. Cross* is based on the traditional rule against such contracts, the district court correctly recognized that this case fits within the exception to that general rule. *See Crater v. Bininger*, 45 N.Y. 545, 549 (1871); 1 A. Corbin, *Corbin on Contracts* § 55, at 234 (1963). The obligations arising from the $20/$12 split between Deutsch and the partnerships obviously "can be determined without going into the partnership accounts," *Crater*, 45 N.Y. at 549, or the "internal affairs of the partnership," *Roberts v. Astoria Medical Group*, 43 A.D.2d 138, 139, 350 N.Y.S.2d 159, 161 (1973). Dr. Deutsch's division of

---

6. *E.g., Wesson v. Galef*, 286 Fed. 621, 622–23 (S.D.N.Y.1922); *Railsback v. Lovejoy*, 116 Ill. 442, 447–48, 6 N.E. 504, 506 (1886); *Nashville, C. & St. L. Ry. v. Davis*, 21 Tenn.App. 663, 114 S.W.2d 830, 835–36 (1937); *accord* J. Story, *Commentaries on the Law of Partnership* § 27 (5th ed. 1859).

the HIP fee was not a traditional partnership profit-sharing agreement. Indeed, Dr. Deutsch's $20 payment to the partnership was a cost of performance on his part of the underlying contract with HIP. As the district court pointed out, Dr. Deutsch had an arrangement with one partnership, Staten Island Audiological Services, in which he was not a partner. If HIP had failed to refer HIP patients who would have been tested on Staten Island, the subcontracting fee that Dr. Deutsch would have avoided having to pay would have been deducted from his recovery as a cost of performance. Thus he would have obtained only $12, that is, $32 under the contract less $20 for the subcontracting fee. The only difference between his arrangement with the Staten Island Audiological Services and his arrangement with his own partnerships is that he would have recovered one-third of the net profits of the latter. The district court awarded precisely that amount.[7] The district court decision places Dr. Deutsch in the same position he would have been in if the contract had been performed, but no better position.

## Hearing Aid Dispensing Damages

Hearing aid dispensing damages were awarded as consequential lost partnership profits, *see* supra note 7. HIP argues that, because N.Y.Gen.Bus.Law § 785–a forbade audiologists, among others, from "engag[ing] in the business of fitting, renting or selling hearing aids for a profit,"[8] the

---

**7.** The district court's calculations were as follows (footnotes omitted):

### Lost Profits to Dr. Deutsch's Partnerships

| | |
|---|---:|
| Audiograms (at $20) | |
|     from East Nassau Medical Group (3,946 tests) | $ 78,920 |
|     from others (682 tests) | 13,640 |
| ENG's (at $45) | |
|     from East Nassau Medical Group (564 tests) | 25,380 |
|     from others (18 tests) | 810 |
| BSER's (at $100) | |
|     from East Nassau Medical Group (70 tests) | 7,000 |
|     from others (3 tests) | 300 |
| Hearing aids at $225 (net of instrument cost) | |
|     from East Nassau Medical Group (275 sales) | 61,875 |
|     from others (47 sales) | 10,575 |
| Referrals | |
|     audiograms at $50 (217 tests) | 10,850 |
|     hearing aids at $225 (26 sales) | 5,850 |
| Gross Revenues Lost to Partnerships | $215,200 |
| Less: | |
|     Audiologist's salary at $13.75 per hour | |
|       for 682 audiograms at 40 mins. each | (6,252) |
|       for 47 hearing aid sales at 2 hours each | (1,293) |
|       for 3 BSER's at 1-½ hours each | ( 62) |
|     ENG technician's salary at $8 per hour | |
|       for 582 ENG's at 1 hour each | (4,656) |
|       for 200 hours travel time | (1,600) |
|     Administrative expenses for 1,220 tests at $.85 each | (1,037) |
| *Total Net Profits Lost to Partnerships* | $200,300 |
| Dr. Deutsch's ⅓ share of the above | 66,767 |
| Less: | |
|     Dr. Deutsch's ½ share of savings in Masone's | |
|       salary 1/1/82–12/9/82 | (2,400) |
| *Total Net Profits Lost to Dr. Deutsch as a Partner* | $ 64,367 |

---

**8.** Section 785–a(2), before amendment, provided:

No otorhinolaryngologist, licensed audiologist, or other licensed physician who has con-

damage award is improper; HIP claims that the profits were illegal and that, in the alternative, the damages were unforeseeable. We reject both arguments.

■ We hold that the district court was not incorrect in finding that the amendment of this provision bars HIP's illegality argument. Section 785–a was amended effective August 8, 1983, 1983 N.Y.Laws ch. 873, § 1, by deleting "licensed audiologists" from the proscriptive terms of the section. The repeal was precipitated by the preemption of other parts of the provision by the Federal Medical Devices Act of 1976,[9] and the regulations promulgated pursuant to the Act.[10] Dr. Deutsch contends that the district court correctly found that the repeal was remedial in nature and operated retroactively. *See Cady v. County of Broome*, 87 A.D.2d 964, 965, 451 N.Y.S.2d 206, 207 (1982), holding that a statute giving police officers benefits for injuries in line of duty was to be retroactively applied. The district court held that under New York law a contract may be affected " 'by a subsequent statute announcing a new public policy ... or by repeal of a prohibitory act.' " *Goldfarb v. Goldfarb*, 86 A.D.2d 459, 461, 450 N.Y.S.2d 212, 214 (1982) (quoting 10 N.Y.Jur., Contracts § 129, at 23–24 (1960)). That is to say, the repeal of a prohibitory statute invalidating a contract violative of its provision renders the contract valid and enforceable and not subject to the defense of illegality. *See id.; see also Curtis v. Leavitt*, 15 N.Y. 9, 154 (1857) (immaterial whether repeal occurred before or after law suit unless act is limited to contracts thereafter to be made or actions thereafter to be brought). The district court distinguished *Toll v. Friedman*, 272 A.D. 587, 590–91, 74 N.Y.S.2d 176, 179 (1947), where the New York court allowed the defense of illegality under the Emergency Price Control Act of 1942, both because the wartime price control legislation had a savings clause authorizing the government to continue to prosecute violations occurring prior to repeal and because the lifting of price controls did not involve a change in policy concerning the wisdom of such emergency measures. Section 785–a, however, was amended because the statute did not serve the public interest after the preemption of federal law of certain portions of the state statutory scheme. As the trial court held, the repeal should be given effect retroactively at least to the time of preemption in 1977, before the time the contract was made.

■ As noted above, we also reject HIP's alternate argument that the lost hearing aid profits were unforeseeable at the time the contract was entered into and hence not recoverable as consequential damages. *See Spang Industries, Inc. v. Aetna Casualty & Surety Co.*, 512 F.2d 365, 368 (2d Cir.1975); *Charles E.S. McLeod, Inc. v. R.B. Hamilton Moving & Storage*, 89 A.D.2d 863, 864–65, 453 N.Y. S.2d 251, 253 (1982). Here the district court specifically found that Dr. Harris advised Dr. Deutsch during the contract negotiations that he could expect to sell hear-

ducted an examination and issued a written recommendation pursuant to subdivision one of section seven hundred eighty-four of this article, shall engage in the business of fitting, renting or selling hearing aids for a profit; provided however that such not-for-profit fitting, renting or selling shall only include the cost of the hearing aid plus such other reasonable and necessary costs and expenses to be established by rule and regulation promulgated by the secretary. No otorhinolaryngologist, or licensed audiologist, or licensed physician who has conducted an examination pursuant to subdivision one of section seven hundred eighty-four of this article shall refuse or fail to perform repairs or service on any hearing aid sold pursuant to this subdivision.

9. 21 U.S.C. § 360k(a) (1982).

10. Before the repeal and at the time the contract was made, New York Gen.Bus.Law § 784 provided that hearing aids could not be provided without a prior examination and a written report by a physician or a licensed audiologist. In 1977, however, the Food and Drug Administration promulgated a regulation that forbade audiologists from performing the examination that was a predicate to hearing aid dispensing. *See* 21 C.F.R. § 801.421(a) (1984). In 1980, the FDA specifically refused to except New York from this regulatory scheme. 45 Fed.Reg. 67,-335 (1980).

68

ing aids to HIP patients as a collateral benefit of performing the contract. HIP has failed to show that the district court was clearly erroneous in finding that hearing aid profits were within the specific contemplation of the parties at the time of contracting.

*Going Concern Value*

■ At the same time, the court held that Dr. Deutsch could not recover consequential damages based upon the loss in value to Great Neck Audiology Associates, because, at the time the contract was signed, HIP had no reason to know that a breach would result in a loss to the going concern value of a subcontracting partnership of which he was a member, nor would such a result have been foreseeable as a result of a natural or probable consequence of the breach. Again, the district court was not clearly erroneous in finding that these damages were at best speculative and at most remote. Moreover, the loss is entirely dependent upon a continuation of the contract beyond June 30, 1984, a matter which, in light of the events leading up to this law suit, was the furthest thing from the parties' contemplation.

*Testing by Superspecialists*

■ Dr. Deutsch argues that the exclusivity provisions of the contract entitle him to damages from the lost fees from some 557 audiological tests and accompanying ENG and BSER testing performed by ear, nose, and throat doctors to whom HIP patients had been referred for nonaudiological services. The district court relied on language in the contract that Dr. Deutsch's examinations were to be "performed upon referral by a HIP physician," [11] and stated that "[w]e do not believe that there is an audiological referral where a patient is referred to a specialist for other purposes and the specialist in his discretion decides to perform an audiogram." Judge Sand observed that on some occasions these su-

perspecialists would perform an audiogram incident to a consultation for another purpose without billing HIP and frequently performed such evaluations even where no request was made by the HIP physician. The district court held that when a HIP physician referred a patient to a superspecialist who performed an incidental audiological evaluation, there simply was not an "audiological ... referral" within the meaning of the contract. We find the district court's interpretation of the contract sound and its related findings of fact not clearly erroneous.

CONCLUSION

While there are some points upon which reasonable contentions could be and have been made, in sum and substance this case comes down essentially to a combination of findings of fact by the district judge, which after hearing conflicting evidence and arguments of the parties were carefully made and clearly not "clearly erroneous," as well as questions of New York law. The district judge gave careful attention to these state law questions; as a judge coming from the state of New York, familiar with New York authority, he is entitled to some deference by an appellate tribunal sitting in a diversity case. *See Bernhardt v. Polygraphic Co. of America, Inc.*, 350 U.S. 198, 204–05, 76 S.Ct. 273, 277, 100 L.Ed. 199 (1956). Therefore the judgment of the district court is in all respects affirmed.

Judgment affirmed.

---

11. The contract states that Dr. Deutsch has "the exclusive right to furnish to [HIP] all audiological services which [HIP] may require" and that "[a]udiological evaluations are to be performed upon referral by a HIP physician."